# UNITED STATES DISTRICT COURT

__NORTHERN__ DISTRICT OF __ILLINOIS, EASTERN DIVISION__

UNITED STATES OF AMERICA

v.

UGUR YILDIZ

**MAGISTRATE JUDGE KEYS**

# FILED

JUN 1 8 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

CRIMINAL COMPLAINT
**CASE NUMBER:**

# 08 CR 480

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. Between on or about April 15, 2006, and June 15, 2006, inclusive, in <u>Cook</u> County, in the <u>Northern</u> District of <u>Illinois</u>, <u>Eastern Division</u>, and elsewhere, the defendant did

illegally export firearms

in violation of the Arms Export Control Act, Title 22, United States Code, Section 2778(b)(2);

I further state that I am a <u>Special Agent of the United States Immigration and Customs Enforcement Agency</u> and that this complaint is based on the following facts:

PLEASE SEE ATTACHED AFFIDAVIT.

Continued on the attached sheet and made a part hereof: __X__ Yes _____ No

Luke S. Lambert, Special Agent
United States Immigration and Customs
Enforcement Agency

Sworn to before me and subscribed in my presence,

June 18, 2008
Date

at Chicago, Illinois
City and State

Arlander Keys, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

STATE OF ILLINOIS        )
                         )
COUNTY OF COOK           )

**AFFIDAVIT**

Luke S. Lambert, being duly sworn, deposes and states as follows:

## I.    PRELIMINARY MATTERS

1.      I am a Special Agent with the United States Immigration and Customs Enforcement Agency ("ICE").  I have been employed with ICE as a Special Agent since February 2006.  From July 2003 to February 2006, I was employed by the United States Customs and Border Protection Agency as a United States Customs and Border Protection Officer.  Prior to that, I served in the United States Army for five years.  I have received training on investigative techniques, as well as training on all aspects of the laws and regulations of the United States governing firearms.  Among other training, I have completed the Basic Criminal Investigator Training Program and the Immigration and Customs Enforcement Special Agent Training Program at the Federal Law Enforcement Training Center.  I also have completed the Strategic Investigations Training Seminar, which provided training specifically addressing United States export control involving national security and foreign policy.

2.      The purpose of this affidavit is to establish probable cause in support of a criminal complaint against UGUR YILDIZ, a/k/a "Mike YILDIZ," ("YILDIZ") for violations of the Arms Export Control Act ("AECA"), Title 22, United States Code, Section 2778(b)(2), specifically for the illegal export of firearms.

(a) The AECA authorizes the President to control the import and export of "defense articles," and further authorizes the President to designate those

1

items which shall be considered as "defense articles." Title 22, United States Code, Section 2778(a)(1). The President has designated defense articles to include, among other things: "Nonautomatic and semi-automatic firearms to caliber .50 inclusive (12.7mm); fully automatic firearms to .50 caliber inclusive (12.7 mm); combat shotguns (this includes any shotgun with a barrel length less than 18 inches); silencers, mufflers, sound and flash suppressors; riflescopes manufactured to military specifications; barrels; cylinders, receivers (frames) or complete breech mechanisms." Title 22, Code of Federal Regulations, Section 121.1 (Category 1) ("Firearms, Close Assault Weapons and Combat Shotguns"). The designation by the President of items as defense articles is not subject to judicial review. Title 22, United States Code, Section 2778(h).

(b) The AECA further provides that no defense articles designated by the President may be exported or imported without a license for such export or import. Title 22, United States Code, Section 2778(b)(2). The regulations require a person who exports defense articles as defined above to obtain a license from the Directorate of Defense Trade Controls (Department of State) prior to such export. Title 22, Code of Federal Regulations, Section 123.1.

(c) A person who willfully violates any provision of Title 22, United States Code, Section 2778, or any rule or regulation issued under the section, shall upon conviction be fined for each violation not more than $1,000,000 or imprisoned not more than ten years, or both.

2

3.     This affidavit is based upon my personal knowledge of this investigation, and also upon information provided to me by other law enforcement agents and other government and regulatory officials, as well as my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned about this matter.

## II.    YILDIZ'S APPLICATION FOR A LICENSE TO SELL FIREARMS

4.     On or about February 1, 2002, YILDIZ applied to the Bureau of Alcohol, Tobacco & Firearms ("ATF") for a Federal Firearms License ("FFL"), Type 01 Dealer, for the purpose of operating a gun shop under the name "Chicagoland Bells," located at 3319 North Manheim Road, Franklin Park, Illinois.

5.     On March 28, 2002, pursuant to the licensing process, inspectors from ATF conducted a full field application inspection at Chicagoland Bells, Inc. YILDIZ was present and met with ATF inspectors. YILDIZ represented to ATF inspectors that he was a citizen of Turkey but had applied for United States citizenship and his application was pending. YILDIZ further represented to ATF inspectors that he was the sole responsible party and sole corporate officer for Chicagoland Bells. He also represented to the inspectors that although he employed two other people, only he would be responsible for maintaining proper records required by the ATF, placing orders with vendors, and directing business operations. In that meeting, inspectors reviewed with YILDIZ the record keeping regulations and laws applicable to the operation of a firearms business, including sales at gun shows and importation and exportation of firearms and ammunition.

3

6.    Specifically, YILDIZ informed ATF inspectors that he was a citizen of Turkey, and YILDIZ asked questions about the importation and exportation of firearms, specifically stating that he was interested in exporting firearms to Turkey.  One of the ATF inspectors explained to YILDIZ that the FFL did not authorize him to export firearms outside the United States, and that the United States laws and regulations prohibited the export of firearms and ammunition without specific licensing and authorization by the Department of State ("DOS").  The ATF inspector provided YILDIZ with a copy of the Federal Firearms Regulations Overview and Receipt Certification, which also stated that United States law required a separate export license issued by DOS to export firearms. In light of YILDIZ's interest in exporting firearms, the ATF inspector specifically directed YILDIZ to page 116 of the Federal Firearms Regulations Reference Guide for information about exporting firearms.  The ATF inspector also filled out a two-page ATF form which lists the topics to be reviewed with an applicant, and documented on that form "pg 116 exporting firearms importing ammunition" to memorialize that the ATF inspector had, in fact, reviewed with YILDIZ the laws restricting export of firearms, and to document that YILDIZ had been directed to page 116 of the Federal Firearms Regulations Reference Guide for information about exporting firearms.  YILDIZ signed his acknowledgment that the inspector had explained the information listed on the document (including export of firearms), that the inspector had answered his questions regarding this information, that he had received a copy of the document listing the topics covered, and that he was responsible for familiarizing himself with all the laws and regulations governing his firearms business.  The ATF Inspectors further noted in their report that they had covered the topic of importation and exportation of firearms with

4

YILDIZ. Among other reasons, the ATF inspector specifically recalls the discussion with YILDIZ because of his interest in exporting firearms and his stated urgency in obtaining the FFL.

## III. REVOCATION OF YILDIZ'S FEDERAL FIREARMS LICENSE AND TRANSFER OF THE FIREARMS TO YILDIZ

7.    In 2003, the ATF conducted the first annual inspection of Chicagoland Bells, for the purpose of ensuring compliance with all laws and regulations governing the FFL. During the inspection, ATF discovered more than 500 willful violations of the Gun Control Act. As a result of these numerous willful violations, ATF revoked the FFL held by Chicagoland Bells, Inc. effective September 12, 2005.

8.    At the time the FFL of Chicagoland Bells was revoked, Chicagoland Bells had a known inventory in excess of 200 firearms. On September 11, 2005, YILDIZ transferred ownership and registration of the 207 firearms from Chicagoland Bells Inc. ("Chicagoland Bells"), into his own name. At that time, YILDIZ filed a Firearms Transaction Record and Report of Multiple Sale or Other Disposition of Pistols and Revolvers with ATF, indicating the transfer of ownership and registration of the 207 firearms to his own name, and also recorded the transfer of ownership in the records of Chicagoland Bells. Presently, those guns remain registered to YILDIZ. (The whereabouts of other firearms in the inventory of Chicagoland Bells remain unknown.)

## IV. YILDIZS GUNS ARE FOUND IN CANADA

9.    Beginning on or about June 2006, and continuing through the present, Canadian law enforcement has recovered 25 guns in Canada that are registered to YILDIZ. Law enforcement recovered all but one of the guns during execution of search

warrants, executed in connection with investigation of conspiracy involving drug and violent crimes. One of the guns was left in a taxi in Canada. Two of the guns registered to YILDIZ were traced to attempted homicides in Canada.

    10.    Specifically, the following guns registered to YILDIZ were recovered in Canada:

    (a)    On June 28, 2006, pursuant to a search warrant executed in Toronto, Canada, Canadian Law Enforcement authorities recovered a 9mm, Magnum Research, Baby Eagle handgun, serial number 34307020;

    (b)    On September 1, 2006, pursuant to a search warrant executed in Toronto, Canada, Canadian Law Enforcement authorities recovered the following firearms: a .50 caliber, Magnum Research, Desert Eagle pistol, serial number 33203349; a 9mm, Glock, model 17 pistol, serial number FXL587; a .45 caliber, Glock, model 21 pistol, serial number FVZ099; a 9mm, Walther, model P1 pistol, serial number 118586W680; a .45 caliber, H&K, model USP45 pistol, serial number 29-025798, and a .22 caliber, Browning, Buckmark pistol, serial number 655PR15284;

    (c)    On September 10, 2006, pursuant to a search warrant executed in Toronto, Canada, Canadian Law Enforcement authorities recovered a .22 caliber, North American Arms, model NAA22 revolver, serial number L062765;

    (d)    On September 17, 2006, a taxi driver in Toronto, Canada, recovered a firearm after the passenger departed without payment of the fare. The firearm, a .38 caliber, Taurus, model 82 revolver, serial number XC180424 was turned over to Canadian Law Enforcement;

    (e)    On September 22, 2006, pursuant to a shooting in Toronto,

Canada, Canadian Law Enforcement authorities recovered a .45 caliber, Glock, model 36 pistol, serial number FSH848;

(f)     On November 25, 2006, pursuant to an arrest for an attempted shooting, the Waterloo Regional Police Service located in Ontario, Canada, seized a 9mm, Vulcan, Mac-9 machine pistol, serial number G5087;

(g)     On December 1, 2006, pursuant to confidential information provided to the York Regional Police Service located in Ontario, Canada, regarding firearms hidden in an abandoned residence, two .38 caliber, Taurus, model 82 revolvers, serial numbers XC180387 and XC180388 were seized;

(h)     On January 5, 2007, pursuant to the arrest of a subject in Toronto, Canada, Canadian Law Enforcement authorities seized a .38 caliber, Taurus, model 82 revolver, serial number XC180390;

(i)     On March 25, 2007, pursuant to a search warrant executed in Toronto, Canada, Canadian Law Enforcement authorities seized a .38 caliber, Charter Arms, Undercover model revolver, serial number 40537;

(j)     On May 24, 2007, in relation to an arrest for gun possession, Canadian Law Enforcement authorities seized a .38 caliber, Smith and Wesson, model 64 revolver, serial number 1D7756;

(k)     On September 28, 2007, pursuant to a search warrant executed in Toronto, Canada, Canadian Law Enforcement authorities seized a .357 caliber, Taurus, model 608B6 revolver, serial number UG896548;

(l)     On December 12, 2007, pursuant to a search warrant executed in

7

Toronto, Canada, Canadian Law Enforcement authorities seized a .38 caliber, Taurus, model 82 revolver, serial number XC180380;

(m)    On January 5, 2008, pursuant to the arrest of a subject in Ontario, Canada, Canadian Law Enforcement authorities seized the following firearms: a .40 caliber, Taurus, model PT100 pistol, serial number SUC32000; a .40 caliber, Taurus, model PT100 pistol, serial number SVF18152; and a 9mm, Beretta, model 9000S pistol, serial number SZ016249;

(n)    On March 14, 2008, pursuant to an arrest by the Toronto Canada Police Service, Canadian Law Enforcement authorities seized a .45 caliber, API Armscor, model 1911-A1 pistol, serial number AP241298;

(o)    On May 16, 2008, pursuant to a search warrant executed in Toronto, Canada, Canadian Law Enforcement Authorities seized the following firearms: a .357 caliber, SIG SAUER, model P239 pistol, serial number SA462753; a .45 caliber, Ruger, model P90 pistol, serial number 66235299; and a .45 caliber, SIG SAUER, model P220 pistol, serial number G356331.

11.    In addition, on or about September 10, 2006, law enforcement agents in Canada executing a search warrant seized two empty gun boxes which were marked with serial numbers of firearms registered to YILDIZ.

12.    In addition, on or about April 30, 2006, law enforcement officials discovered 15 firearms registered to YILDIZ in a dumpster in a suburb of Detroit, not far from the Canadian border.

8

### V.    YILDIZ ADMITS THAT HE EXPORTED GUNS TO CANADA

13.    On or about October 13, 2006, ATF agents went to 5557 N. Clark Street, Chicago, Illinois, the address appearing on YILDIZ's driver's license, for the purpose of interviewing YILDIZ about the guns found in Canada. When the agents arrived, they found that the location was a restaurant that was under construction at that time. YILDIZ was not present at that location, but a worker at the site offered to call YILDIZ and tell him that the ATF agents wanted to interview him. After the worker made a telephone call, he informed the ATF agents that YILDIZ said that he would come to the site to talk to them, and that they should wait. Approximately a half hour later, YILDIZ came to the site and voluntarily agreed to be interviewed by the ATF agents.

14.    In his October 13, 2006 interview with ATF agents, YILDIZ told the ATF agents that, after closing Chicagoland Bells, he had stored the firearms inventory with Chitown 22 Corporation, a firearms dealer leasing from YILDIZ the former space occupied by Chicagoland Bells. YILDIZ further told the ATF agents that Chitown 22 Corporation had been burglarized and that, approximately one month to one and half months after the burglary, he had moved approximately 237 firearms from Chitown 22 Corporation to a storage facility in Windsor, Canada. [1]

15.    On or about October 27, 2006, federal law enforcement agents, along with two members of Canadian law enforcement, located YILDIZ at 5557 N. Clark Street in

_____

[1]A police report was filed with the Franklin Park Police Department documenting a March 19, 2006 burglary of Chitown 22 and 12 stolen firearms. None of these firearms matched any of the firearms recovered in Canada or from the dumpster in suburban Detroit.

Chicago for the purpose of further interviewing YILDIZ regarding the guns found in Canada. YILDIZ agreed to an interview. At that time, YILDIZ, told the law enforcement agents that he was a naturalized citizen of the United States and had been for approximately the past six years. [This information is contrary to that which YILDIZ provided ATF during the licensing process in 2002.] [2] YILDIZ also denied that he had received any training or had any knowledge of United States export laws regarding firearms, and YILDIZ further stated that the subject was not covered in any way during the FFL application process. YILDIZ further stated that he did not receive any type of literature from ATF that would have provided him with guidance on how to comply with United States export laws with regard to firearms.

16.    During the October 27, 2006 interview, YILDIZ further stated to the law enforcement agents that when he closed Chicagoland Bells, he had an inventory of approximately 250 firearms, which he transferred to his own name. YILDIZ stated that he initially stored the guns at his former business location, now leased by Chitown 22. According to YILDIZ, the business was burglarized in March 2006, and 13 or more guns were stolen. [The police report of the burglary documented 12 guns stolen.] YILDIZ told the law enforcement agents that at the time, he was arranging a shipment of 30 refrigeration units from Canada to Turkey, and that he had been working on the deal with Individual A, a resident of Canada. YILDIZ called Individual A and told him that he had firearms to be shipped to Turkey, and they arranged for YILDIZ to bring the firearms to

---

[2]YILDIZ was naturalized in 2003, despite information in his ICE file stating that he was not to be naturalized due to issues concerning YILDIZ'S identity. ICE currently is investigating YILDIZ's status in the United States.

Windsor to be stored. YILDIZ further admitted to the agents that he loaded approximately 220 guns into the back of his green Chrysler Caravan and drove straight from his shop into Windsor. YILDIZ admitted that at the border crossing, he did not declare the firearms that he was carrying in his car, and that he had declared that the purpose of his crossing was "to visit." When asked why he lied to Canadian Customs about the purpose of his crossing, YILDIZ told the law enforcement agents that he did not have to tell Canadian Customs anything. YILDIZ was unsure of the exact date of this trip.

17.    During the October 27, 2006 interview, YILDIZ further stated to the law enforcement agents that after passing the border crossing, he drove to the prearranged meeting site with Individual A, a McDonald's restaurant on the other side of the bridge. There, Individual A was waiting in the parking lot. YILDIZ further told the law enforcement agents that he followed Individual A to a storage facility, where Individual A and he made two trips to unload the guns from YILDIZ's car to the storage unit. YILDIZ stated that he unloaded the approximately 220 guns from his car and put them in the storage unit, and then put a lock that he had brought with him from home on the door to the storage unit. After locking the storage unit, YILDIZ stated that he gave one of the keys to the lock to Individual A and kept the other key to the lock.

18.    During the October 27, 2006 interview, YILDIZ further stated to the law enforcement agents that he stayed in Canada overnight and then left. YILDIZ further stated that over the next month, he spoke to Individual A several times about the deal for export of refrigeration units [which deal never was culminated], and that, during one of these telephone conversations, Individual A offered to purchase the firearms that YILDIZ

11

had brought to Canada for $20,000. YILDIZ told the law enforcement agents that the guns were worth more than the $20,000, and that he told Individual A that the price was too low. YILDIZ claimed that the value of the firearms was about $30,000. YILDIZ claimed that he never spoke to Individual A again and has not been able to reach Individual A on his cell phone since that time.

19.    During the October 27, 2006 interview, YILDIZ further stated to the law enforcement agents that he had not given Individual A permission to sell or move his firearms. He further stated that he did not know the address of the storage facility where he had left them, he had not received any type of receipt for the firearms, and he had no record or other documentation of his ownership of the firearms [despite leaving $30,000 worth of firearms in the facility, and turning down a $20,000 purchase offer for the firearms]. YILDIZ also gave the law enforcement agents permission to review a journal in which he had documented numerous business transactions in detail, including firearms purchases, but there was no entry regarding the transfer of the 220 firearms that YILDIZ had exported from the United States to Canada.

20.    On October 27, 2006, YILDIZ wrote a statement admitting his exportation of firearms to Canada, and signed it. During the October 27, 2006 interview, YILDIZ also provided law enforcement agents with a list of 207 firearms that he had transferred into his own name. YILDIZ did not provide any documentation of the export of the firearms to Canada. YILDIZ permitted law enforcement agents to review his journal of business transactions, including firearms transactions, but the export of firearms to Canada was not recorded in that journal.

## VI.    CORROBORATION OF YILDIZ'S EXPORTS TO CANADA

21.    Records show that after YILDIZ closed Chicagoland Bells and transferred the remaining inventory firearms into his own name, and after the March 2006 burglary of Chitown 22, YILDIZ made the following border crossings at the Detroit Ambassador Bridge in 2006: On April 15, 2006, at 10:02 p.m. YILDIZ entered Canada, and returned to the United States at 10: 35 a.m. the next day; on June 3, 2006, at 6:03 p.m., YILDIZ entered Canada and returned to the United States at 1:54 p.m. on June 5, 2006; and on June 14, 2006, at 2:13 p.m., YILDIZ entered Canada and returned to the United States at 4:33 a.m. the next day.

22.    Phone records for October 27, 2006, the day that law enforcement officials conducted a second interview of YILDIZ in which YILDIZ claimed that he could not reach Individual A, show that after law enforcement agents left YILDIZ's residence, YILDIZ called Individual A.  Individual A canceled his cellular phone number that same day.

23.    Telephone records further show that YILDIZ was in telephone contact from at least approximately June 13, 2006 through July 4, 2006, with Individual B, who was arrested on January 5, 2008, in possession of three firearms registered to YILDIZ, as described in paragraph 10(m), above.

## VII.    YILDIZ NEVER OBTAINED THE NECESSARY AUTHORITY TO EXPORT FIREARMS

24.    As set forth in paragraph 2 of this affidavit, the AECA prohibits exportation of defense articles without a license for such export.  Title 22, United States Code, Section 2778(b)(2).  As further set forth in paragraph 2 of this affidavit, the

President has designated certain firearms as defense articles, and requires that a person exporting such defense articles must obtain a license from the Department of State, Directorate of Defense Trade Controls, before such export. Title 22, Code of Federal Regulations, Sections 121.1 and 123.1.

25.    Most, if not all, of the firearms registered to YILDIZ fall within the President's designation of defense articles.

26.    As of February 7, 2007, YILDIZ had not applied for, nor had he received, a license or other authorization from the Department of State, Directorate of Defense Trade Controls, to export firearms.

27.    Based on the foregoing information, there is probable cause to believe that UGUR YILDIZ has violated Title 22, United States Code, Section, 2778(b)(2).


FURTHER AFFIANT SAYETH NOT.

Luke S. Lambert
Special Agent, ICE

SUBSCRIBED AND SWORN TO BEFORE
ME THIS 18TH DAY OF JUNE 2008.


ARLANDER KEYS
MAGISTRATE JUDGE

14